**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

GWENDOLYN WILLIAMS,

Plaintiff,

v. Case No. 8:25-cv-473-KKM-LSG

OAKLEY TRANSPORT, INC.,
*doing business as* OAKLEY,

Defendant.

---

**ORDER**

Oakley Transport, Inc., moves for summary judgment on Gwendolyn Williams's claims that Oakley discriminated against her based on race and terminated her employment as retaliation in violation of 42 U.S.C. § 1981, and that it violated the Florida Civil Rights Act and Workers' Compensation Law. *See* MSJ (Doc. 47); Am. Compl. (Doc. 12). I grant in part and deny in part the motion. Because Williams presents insufficient circumstantial evidence to support a charge of intentional discrimination based on race or retaliation, I grant summary judgment on the Section 1981 claims in favor of Oakley. I remand all state law claims because I lack jurisdiction over the workers' compensation claim and I decline to exercise supplemental jurisdiction over the rest.

# I. BACKGROUND

## A. Tenure with Oakley

Oakley hired Gwendolyn Williams, a black woman, as a truck driver in May 2021. Am. Compl. ¶ 6; 2d JSUF (Doc. 34) ¶ 1. Williams first worked out of Oakley's terminal in Savannah, Georgia. Am. Compl. ¶ 21. During employee training, Williams lacerated her hand, causing nerve damage. JSUF ¶ 2; Williams Dep. (Doc. 53-43) 69:4–15. She sought medical treatment and filed a workers' compensation claim, which Oakley approved. Resp. (Doc. 52) at 4; Am. Compl. ¶ 12.

The record is unclear as to when Williams returned to work. Oakley asserts that Williams went "on leave for approximately six months until" December 2021. MSJ ¶ 12. Williams does not contest this fact in her "Response to [Oakley's] Statement of Facts," *see* Resp. at 2, but elsewhere recounts that she "continued working" despite her condition and that Human Resources Manager Melissa Royce instructed a doctor to send her back to work. *See id.* at 4–5. I accept Williams's account of the facts for purposes of this motion.

In any event, no party disputes that Williams was back driving for Oakley by December 2021. *See* MSJ ¶ 12; Resp. at 7. Over the next few months, Williams "transferred between terminals multiple times" and "was promoted to senior status in March, 2022." *Id.* at 3. Still, her injury persisted, and Oakley

did not approve disability benefits and medical treatment.[1] *See* Williams Dep. 106:1–109:12. On June 14, 2022, Williams hired a workers' compensation attorney. Resp. at 7, 20–21. Around the same time, Williams sought—and an Oakley representative approved—a personal leave of absence to undergo surgery. Resp. at 7.

Williams did not return the truck to Oakley while she was away, although Oakley does not claim that she was told to do so. *See* MSJ ¶ 145. On July 12, 2022, three days before Williams was due to return to work, Resp. at 8, Oakley sent an employee "to retrieve its truck parked at [Williams's] residence." MSJ ¶ 15. The employee arrived with a police officer "and told [Williams] that [Oakley] had accused her of stealing a truck." Resp. at 8–9. Shortly after, Oakley terminated Williams's employment for cause. *Id.* at 8. A separation document attributes her firing to failing to return to work after an "unapproved" leave and acting unprofessionally during the truck retrieval, including threatening the Oakley employee and necessitating law enforcement intervention. *See* (Doc. 53-38).

Williams maintains that the proffered reasons were false. Resp. at 8–9. She offers documentation approving her leave and a sworn declaration of the

[1] Williams's testimony is hard to follow on this issue. For example, she does not specify exactly what treatments Oakley denied or which disability benefits she sought. *See, e.g.*, Williams Dep. 106:5–23.

police officer at the scene that she acted professionally during the encounter. Gainer Decl. (Doc. 53-41). Likewise, the record shows that an Oakley employee called police *before* going to her house and requested "assistance in going to get a semi off a terminated employee[']s property" because the "woman has been violent." *Id.* ¶ 3; *see* Resp. at 9. Oakley does not dispute this evidence and suggests that it might have terminated her employment based on receiving "erroneous" information about her conduct. *See* Reply (Doc. 58) at 10.

**B. Compensation**

According to Williams, Oakley failed to compensate her properly from the outset. *See* Williams Dep. 48:1–9. This failure included the denial of her full pay rate, a veteran's sign-on bonus, a performance bonus, and compensation for training. Resp. at 11–12.

Under Oakley's policies, several factors influenced driver pay. Some drivers were "paid by miles" and others based on job completion. Wester Dep. 49:5–51:16. Williams agreed to be paid at a "shift pay rate," which varied based on the driver's position and the location of "the terminal" (or home base) "to which the driver is assigned." MSJ ¶ 8. According to Williams, actual pay could also change based on the duration of the job. Williams Dep. 48:24–49:13. Similarly, drivers could obtain performance-based bonuses. Josefik Dep. (Doc. 53-45) 7:5–15. For example, a driver might get a bonus for driving over 10,000 miles in a month, at which point the driver would earn more per mile for a

given period. *Id.* Of course, the amount actually received varied based on an employee's withholdings, deductions, and retirement contributions. Reply at 2.

The parties dispute Williams's agreed-upon pay rate. Oakley offers a signed employment agreement showing a starting rate of $250 per shift, which rose soon after to $260 per shift. MSJ at 3; Everitt Decl. (Doc. 47-1) at 10. Williams denies that the signature is hers and insists that she agreed to be paid $310 per shift, offering her own sworn testimony in support. Resp. at 1–3. Williams's pay rate changed at least twice more during her tenure, in part because she changed terminals. *See* MSJ ¶ 6.

As for bonuses, the parties agree that Williams received a sign-on bonus of $2,000 but dispute whether she was entitled to more. MSJ at ¶¶ 4–5; *see* Resp. ¶¶ 4–5. Williams avers that an unnamed Oakley recruiter promised her a $7,500 veterans' sign-on bonus and that her manager, Jason Josefik, told her how to obtain it, but that Oakley denied her application, at first on the grounds that she was not a veteran (she is), and then without explanation. Resp. at 6; Williams Dep. 34:1–36:13. According to Oakley, "the veteran sign-on bonus program did not even take effect until after [Williams's] hire; nor did any employees of [Oakley] receive veterans' sign-on bonuses during [Williams's] tenure." MSJ at 10. Oakley offers an official policy document to this effect. Everitt Decl. at 8. Williams denies Oakley's explanation and points to her own

testimony that she spoke about the bonus with other employees, but she does not dispute the authenticity of the policy document. *See* Resp. ¶¶ 4–5.

As for other bonuses, Williams maintains that Safety Manager Ron Fargo promised her a performance bonus "but she never received it." Resp. at 7 (citing Williams Dep. 166:8–168:17, Williams Aff. (Doc. 53-42) ¶ 22). She offers her own deposition testimony that Fargo, who is black, "was very favorable to [her] in the very beginning" but sided with other Oakley personnel when she disputed her pay and denied promising her anything. Williams Dep. 166:12–168:2. Williams's testimony is inconsistent as to whether Fargo acted because of race. When asked whether she thought he treated her differently because of race, she responded that "Ron was more of the gender guy," Williams Dep. 166:11–12, but later averred that "it could be because of [her] race," *id.* at 168:6. Williams reasoned that Fargo changed "when he joined Teams with" an "office of people" who "are white." Williams Dep. 169:7–19. There are no other details about the bonus.

Regarding training, Williams asserts that she was "the only black woman in training" and "the only employee who did not receive full training pay." Resp. at 7. Oakley offers pay statements showing that it paid Williams $1,500 total for ten days of training and insists that Williams "was fully compensated . . . ." MSJ ¶ 10. Williams does not contest the authenticity of the pay statements but "[d]enie[s] that [she] was paid for all training days." Resp.

¶ 10 (citing Williams Dep. 38:13–41:16, in which Williams testifies that Oakley employees told her she was owed more).

**C. Complaints**

According to Williams' response, she "complained of racial and gender discrimination almost from the start of her employment and continued to complain until [Oakley] fired her." Resp. at 21. Specifically, she reported discrimination "to Defendant's agents, including HR employees Duchscherer, French, Hale, Royce, and Everitt, as well as John Wester, and [her] supervisors, including Jason Josefik." *Id.* at 20.

Williams provides a date only for one complaint of racial discrimination, an August 2021 "verbal[]" report to human resources managers Peggy French and Cindy Hale. *See id.* at 5. Williams continued to complain to French, who eventually "got so annoyed with [Williams's] repeated calls that she ordered [Williams] not to call her anymore and told [a supervisor] to stop [Williams] from calling her." *Id.* Williams alleges that French, as well as benefits specialist Duchsherer, showed racial animus by referring to her as "missy" and "gal," even after Williams asked her to stop. Williams Dep. 163:4–23; Williams Aff. ¶ 15. Williams asserts that these are "old slave name[s]." Williams Dep. 163:4–23.

Oakley responds with testimony from its human resources manager and other supervisors that Williams complained about her pay but did not mention

race. *See* Everitt Decl. ¶¶ 14, 23–24; Josefik Dep. 6:9–16 (remembering "some sort of confusion around the pay scale" but not in "compar[ison] to any other driver's pay").

When asked why she did not put complaints regarding racial discrimination in writing, Williams testified that employees ordinarily communicated by phone, Williams Dep. 177:23–25, that Oakley had no formal reporting system, and that she did not have email addresses for Oakley personnel. *Id.* at 176:4–177:16. Specifically, Williams denied having French's email address until after she went on leave. *Id.* at 176:7–13. In response, Oakley produced an email sent from Williams's account to French in May 2022, before Williams took leave. *See* Everitt Decl. at 70–71. Williams testified that she did not recall sending it but did not deny it was hers. *See* Williams Dep. 179:19–183:10.

In the email, Williams requested to speak with Tom Oakley to discuss "serious questions about my weekly payroll." Everitt Decl. at 70–71. She expressed frustration with her inability to obtain answers, but did not specify that her complaint pertained to race. The email chain shows the parties on the thread attempting to call one another but provides no other details. *See id.*

At least one other time in her deposition, Williams made allegations about Oakley that she later narrowed when confronted with conflicting evidence. She asserted that none of the Oakley supervisors "did anything to

give me back pay" before conceding that they did, in fact, give her around $3,000 in back pay. Williams Dep. 161:24–162:8.

Oakley reports that it provided this backpay after investigating her complaints but does not specify which complaints or when this occurred. MSJ at 11. Nor is it clear whether this pay accounted for Williams's salary or training. *Contrast* Am. Compl. ¶ 22 (alleging that she "received back pay to cover the $50 a day [shift-rate pay] but was shorted $700") *with* Williams Dep. 39:17–41:16 (testifying that she received backpay for employee training but was still owed $700).

**D. Procedural History**

In November 2024, Williams filed suit against Oakley in Florida state court. *See* Compl. (Doc. 1-1). Oakley removed the action, asserting federal question (and supplemental) jurisdiction. *See* Notice of Removal (Doc. 1). Williams brings seven counts: racial discrimination and retaliation under 42 U.S.C. § 1981 (Counts II and VI); race, gender, and disability discrimination, respectively, as well as retaliation under the Florida Civil Rights Act (Counts I, III–V); and workers' compensation retaliation under § 440.205, Florida Statutes (Count VII). Am. Compl. Oakley answered the complaint, *see* (Doc. 13), and moved for partial summary judgment based on the statute of limitations, *see* (Docs. 15, 23), which I denied (Doc. 27). With leave, Oakley

moves again for summary judgment. *See* MSJ. Williams opposes the motion, *see* Resp., and Oakley replies, *see* Reply.

## II. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant always bears the initial burden of informing the district court of the basis for its motion and identifying those parts of the record that demonstrate an absence of a genuine issue of material fact. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). When that burden is met, the burden shifts to the nonmovant to present evidentiary materials (e.g., affidavits, depositions, exhibits, etc.) demonstrating that there is a genuine issue of material fact, which precludes summary judgment. *Id.* A moving party is entitled to summary judgment if the nonmoving party "fail[s] to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The Court reviews the record evidence as identified by the parties and draws all legitimate inferences in the nonmoving party's favor. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020). Here, to the extent that the

record is disputed or capable of multiple inferences, the Court draws them in favor of the nonmovant.

## III. ANALYSIS

"42 U.S.C. § 1981 provides that '[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all laws . . . as is enjoyed by white citizens.'" *Ismael v. Roundtree*, 161 F.4th 752, 759 (11th Cir. 2025). The Supreme Court has interpreted the statute to provide a private cause of action against "discrimination in private employment" and "for employees who face retaliation for their complaints about workplace discrimination." *Id.* (citation modified).

### A. Discrimination

To survive summary judgment on a discrimination claim, a plaintiff must present sufficient evidence to permit a jury to return a verdict in his favor. *See Lewis v. City of Union City*, 918 F.3d 1213, 1217 (11th Cir. 2019) (en banc). A plaintiff may do that in one of three ways. The first is to present direct evidence of discriminatory intent. *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921–22 (11th Cir. 2018) (explaining that "only the most blatant remarks" count as direct evidence of discrimination (citation omitted)). The remaining methods—and the ones Williams tries—rely on circumstantial evidence. The second is the burden-shifting framework created in *McDonnell Douglas Corp.*

*v. Green*, 411 U.S. 792 (1973). And the third is to "present[] a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Ismael*, 161 F.4th at 760 (citation modified).

Oakley argues that Williams fails to provide an adequate comparator for her prima facie case or to show a mosaic of discrimination. *See* MSJ. I agree on both points and grant summary judgment on Count II.

**i. *McDonnell Douglas* Framework**

A plaintiff proceeding under *McDonnell Douglas* bears the initial burden of establishing a prima facie case of discrimination. *See Lewis*, 918 F.3d at 1220. If the plaintiff makes that showing, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its actions. If the defendant does so, the plaintiff must demonstrate that the proffered reason was merely a pretext for discrimination. I begin and end at the first step.

To make out a prima facie case, Williams must show that (1) she belonged to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the job, and (4) that the employer treated similarly situated employees outside the protected class more favorably. *See id.* at 1220–21.

The parties do not dispute that Williams belongs to a protected class based on her race or that she was qualified for her job. Williams argues that

she "suffered adverse employment actions in the form of" disparate pay, the denial of bonuses, workers' compensation benefits, job termination, and being called "racially offensive . . . names."[2] Resp. at 10–11.

Oakley insists that it paid her in full and argues that Williams does not have evidence that it treated similarly situated employees more favorably. MSJ at 8–9. In response, Williams proposes comparators for her allegations related to workers' compensation, bonuses, and disparate pay. I address each in turn.

### 1. Workers' Compensation

Williams offers fellow driver Charles Hall, a white male, as a comparator for her allegation that Oakley denied her workers' compensation benefits because of race. Resp. at 7. Hall testified that he injured his back while on the job and was unable to work for a month. Hall Dep. (Doc. 53-44) 14:2–19. Unlike Williams, Hall obtained workers' compensation benefits without having to go to "the expense of an attorney." Resp. at 7. Still, Hall testified that, "with workman's comp, it's really tough" and he "maybe got hardly anything." Hall Dep. 14:11–15. As a result, he returned to work after completing therapy. *Id.*

[2] Williams does not explain how being called a racially offensive name alone qualifies as an "adverse action" at the prima facie stage of a disparate pay claim. In any event, because Williams fails to provide a sufficient comparator, I need not reach the question.

Williams does not explain how she and Hall were similarly situated for purposes of obtaining workers' compensation. She does not claim that they shared the same supervisor, that the same individual evaluated their applications, or that their compensation claims for her hand injury and his back injury were comparable. *See* MSJ at 9. "[A]t the prima-facie step, the fact that there are some similarities between the plaintiff and the comparator is not enough. They must be similarly situated 'in all material respects.'" *Johnson v. Miami-Dade Cnty.*, 169 F.4th 1301, 1309 (11th Cir. 2026) (quoting *Lewis*, 918 F.3d at 1224). Williams plainly fails to meet this standard and thus cannot make out a prima facie case that she was treated differently because of race regarding workers' compensation.

**2. Bonuses**

Williams's evidence regarding a veteran's bonus fares even worse. In her response brief, she points to two comparators by name, Hall and Linda Jude, a white female driver. Resp. at 5. She alleges that they received the veteran's bonus but does not cite any evidence apart from her own conclusory affidavit. *See* Resp. at 5 (citing Williams Aff. ¶ 14); *see Johnson*, 169 F.4th at 1309 n.6 (quoting FED. R. CIV. P. 56(c)(4)) (explaining that, when an employee uses her own declaration to provide "the factual basis for the alleged similarities" to her comparators, she must show that she made the declaration on "personal knowledge," "set out facts that would be admissible in evidence," and

demonstrated "competen[ce] to testify on the matters stated"). What is more, Hall disclaimed receiving a veteran's bonus (or knowing that it existed), and there is no other evidence pertaining to Jude. Hall Dep. 16:1–13. As a result, Williams fails to provide a valid comparator for her allegations related to the veteran's bonus. In a similar vein, Hall's testimony that he received a performance bonus at an unspecified time based on unspecified criteria is too vague to provide a comparison to Williams, who does not explain which performance bonus she ought to have received that is similar to Hall's. *See* Hall Dep. at 16.

**3. Disparate Pay**

Williams likewise proposes Jude and Hall as comparators for her disparate pay claim. On the former, she alleges that Jude earned more during a week when the two performed the same deliveries. Resp. at 6. She admits that she never saw Jude's pay records but testifies that Jude showed her a screenshot of a section of her bank statement revealing that she earned more. Williams Dep. 113:11–114:20. Williams does not specify which week, which deliveries, or what the difference in earnings was or any difference in withholdings but asserts that it was "greater . . . by hundreds of dollars more than what I had received." *Id.* at 114:24–115:1. Oakley responds that "a bank deposit does not contain any information regarding hours worked, withholdings, deductions, or retirement contributions," and that Williams has

not shown the two worked out of the same terminal to earn the same pay rate. Reply at 2. I agree with Oakley that Williams's evidence is merely "speculat[ive]" and fails to demonstrate that the two were similarly situated. *See Johnson*, 169 F.4th at 1311.

Williams's evidence for Hall is stronger but still fails to carry her prima facie burden. Unlike Jude, Williams offers testimony from Hall, who confirms that he worked out of the Savannah terminal at the same time as Williams. *See* Hall Dep. 20:11–13. According to Hall, he and Williams compared pay and discussed that Williams made less for "the same exact run." *See* Hall Dep. 21:1–3, 25:1–4; Williams Aff. ¶ 16 ("Hall . . . informed me [he was] earning more money than I for the same dedicated deliveries for which I should have earned an equal amount."); Williams Dep. 55:2–56:15 (testifying that, at an unspecified time, Charles Hall told her that he earned more). Hall admits, though, that he "never saw her paycheck, and she never saw my paycheck," and he "never saw exactly what she made with Oakley." Hall Dep. at 22–23.

Williams never points to details about this "same exact run" for which the two compared their pay or other pertinent comparator information. Neither Williams nor Hall identifies the latter's supervisor, driving experience, pay withholdings, or employment record. *See* MSJ at 10. Most important, Hall does not remember how much more he earned, Hall Dep. 23:4–13, surmises that "everybody got paid different there at Oakley," *id.* 19:18–19, and states that

his shift pay changed at some point but does not say when, *see id* 19:10–21. Neither Williams nor Hall identifies when he earned more, for which runs, or what his actual shift rate was. Hall earned bonuses from Oakley at some point, *see id*. 18:7–10, but Williams does not address whether Hall's pay was higher because of a bonus.

In the absence of any of the above information, Williams fails to present a prima facie case that Oakley treated similarly situated employees more favorably. Indeed, the record is devoid of ordinary evidence to support a disparate pay claim, such as Hall's employment agreement, payroll records, bank deposits, or job logs. Presumably, Hall's payroll records and contract were available in discovery, as Oakley provided Williams's records, which it keeps in its regular course of business. Everitt Decl. ¶¶ 4–5, 8, 12–14. Even if Williams had not sought them during the discovery period, the Federal Rules of Civil Procedure provide flexibility for opponents of summary judgment motions. When facts are unavailable to the nonmovant that are "essential to justify [her] opposition," she may request that the Court "defer considering the motion or deny it" or "allow time to obtain affidavits or declarations or take discovery." FED. R. CIV. P. 56(d). Williams does not invoke this rule.

Absent evidence as to when or how much Hall was paid differently and absent evidence bearing on ordinary pay differentials, such as withholdings, bonuses, or the like, Williams fails to identify a valid comparator. *See* MSJ at

9. As a result, a jury would be left to speculate as to why—and whether—Hall made more at some undetermined time.

**ii. Mosaic**

Because Williams fails to establish a prima facie case, "she 'must produce enough evidence, on her own and without any helpful evidentiary burdens or presumptions, to demonstrate' that a reasonable jury could conclude that she was subjected to adverse employment action because of her race . . . ." *Johnson*, 169 F.4th at 1307 (quoting *Ismael*, 161 F.4th at 765).

The analysis "treats an employment discrimination suit in the same way [a court] would treat any other case—jumping directly to the ultimate question of liability and deciding whether the moving party is entitled to judgment at that stage of the case." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 947 (11th Cir. 2023). In other words, a court asks "whether the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination or retaliation by the decisionmaker." *Johnson*, 169 F.4th at 1308 (citation modified).

The Eleventh Circuit "ha[s] identified three nonexclusive categories of circumstantial evidence that can raise a reasonable inference of unlawful conduct: evidence of suspicious timing, ambiguous statements, or other information from which unlawful intent may be inferred; evidence of

systematically better treatment of similarly situated employees; or evidence that the employer's justification for its action is pretextual." *Johnson*, 169 F.4th at 1309–1310 (quoting *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023)).

Williams fails to marshal enough evidence to show a mosaic of discrimination related to race. Williams's evidence of pay and bonus disparities, as well as workers' compensation, consists almost entirely of her own conclusory testimony, without documentary evidence and lacking in specifics that would allow a jury to infer discrimination. *Cf. Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010) (concluding that a plaintiff's "observation that Cubans 'seem to get terminated at a very high rate without justification,'" without specifics, was "conclusory" and "too weak to raise a genuine fact issue" showing pretext). The same is true even putting aside the lack of comparators. For example, Oakley's unrebutted evidence that no employee received a veteran's bonus during Williams's tenure cuts strongly against any inference that Williams was denied the bonus because of race. *See* MSJ at 10. Williams's allegation that Fargo denied her performance bonus because he joined an office comprised of white employees, *see* Williams Dep. 169:7–19, is too speculative to infer racial discrimination. And Williams's testimony that Hall told her that Oakley paid him more "*because of* [her] race," *id.* at 55:13–18 (emphasis added), is inadmissible hearsay, particularly

because Hall disclaims any knowledge of why Williams allegedly earned less, *see* Hall Dep. 20:2–3 (responding, when asked whether Williams was discriminated against "because she was black," that "I do not know, to be honest with you"); *see Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) ("If . . . the declarant has given sworn testimony during the course of discovery that contradicts the hearsay statement, [a court] may not consider the hearsay statement at the summary judgment phase.").

Williams's remaining evidence of derogatory statements and pretextual termination does not make up the difference. On the former, Williams offers her testimony that Payroll Manager French and Benefits Specialist Duchsherer called her "missy" and "gal," which she identifies as "old slave name[s]." *See* Williams Aff. ¶ 15; Williams Dep. 163:4–23. Oakley responds that "statements by non-decisionmakers cannot serve as evidence of discrimination" and, in any event, Williams does not support "her contention that 'missy' and 'gal' are racial terms . . . ." Reply at 4.

Oakley is correct that"[c]omments by non-decisionmakers do not raise an inference of discrimination." *Jones v. Unity Behav. Health, LLC*, No. 20-14265, 2021 WL 5495578, at *3 (11th Cir. Nov. 23, 2021) (per curiam) (quoting *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355 (11th Cir. 1999)). Williams testified that French had power to *correct* payroll. Willaims Dep. 166:18–24. But she does not point to anywhere in the record "indicat[ing] that [French or

Duchsherer] had any supervisory authority over [her] or w[ere] otherwise involved in [her] termination," setting her pay rate, or giving her bonuses. *See Jones*, 2021 WL 5495578, at *3. In fact, Williams says just the opposite regarding French and bonuses. *See* Williams Dep. 168:13–17 (explaining that "Ron is the person" responsible for bonuses, "[n]ot [French]," and that Ron "has to tell [French] that, we're going to give [Williams] these bonuses"). Nor does Williams dispute that Oakley did, in fact, give her backpay, or provide any specific examples of French declining to correct her pay. On this record, I cannot identify specific adverse actions taken by French, let alone "reasonably infer that [they] were motivated by [French's or Duchsherer's] alleged bias." *See Jones*, 2021 WL 5495578, at *3.

Last, though Williams provides evidence to support her claim that her termination was pretextual, none of it points to *race* as the underlying but-for cause. Given the lack of supporting evidence related to race and Williams's own claims that she was terminated for other reasons (such as her requests for health-related benefits), *see* Resp. at 21–22, there is not enough for a reasonable jury to infer that Oakley discriminated against her based on race. *See Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1148 (11th Cir. 2020) ("An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for

a discriminatory or retaliatory reason." (citation modified)). I grant summary judgment on Count II.

**B. Retaliation**

Oakley seeks summary judgment of Williams's Section 1981 retaliation claim because Williams fails to show that she engaged in protected activity, and, even if she did, that there was a causal connection between the activity and her termination. MSJ at 19–20; Reply at 6–7. Because I agree on the second point and no mosaic of circumstances supports her claim, I grant summary judgment on Count VI.

"The burden-shifting framework for summary judgment on a retaliation claim is the same as for a discrimination claim, with the caveat that the prima facie case for retaliation is different than that for discrimination. To make a prima facie case for retaliation, a plaintiff must show (1) that she engaged in a protected activity, like filing a complaint for discrimination; (2) that she suffered a material adverse action; and (3) that there was a causal connection between the protected activity and the adverse action." *Johnson*, 169 F.4th at 1310 (citation modified). "Circumstantial evidence such as 'close temporal proximity' can support a finding of causation." *Melton v. I-10 Truck Ctr. Inc*, 166 F.4th 905, 916 (11th Cir. 2026) (quoting *Joseph v. Bd. of Regents of Univ. Sys. of Ga.*, 121 F.4th 855, 871 (11th Cir. 2024)).

In her response, Williams generally alleges that Oakley terminated her employment in retaliation for reporting racial discrimination to Oakley personnel.[3] Resp. at 17–18. Her response brief maintains that she "complained of racial and gender discrimination almost from the start of her employment and continued to complain *until Defendant fired her*." Resp. at 21 (citation modified). When so stating in her response, Williams provides no citation to any record evidence. At earlier points in her response, Williams gestures at large swaths of her deposition, Hall's deposition, and her affidavit without any specific citation for the proposition that she continually complained about racial discrimination up until the date she was terminated. *See* Resp. at 5. But Williams had the burden of "citing to particular parts of materials in the record" to support her assertions, FED. R. CIV. P. 56(c)(1), and I need not "ferret out delectable facts buried in [the] massive record" for her, *Chavez v. Sec'y of Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011)).

To demonstrate causation, Williams notes that "the termination occurred *after* [she] reported" discrimination. Resp. at 19 (emphasis added). She says nothing else.

---

[3] Williams also describes as "protected activity" her efforts to report her injury and seek medical treatment. *See* Resp. at 17–18. This argument appears to apply only to her claims of disability-related and workers' compensation retaliation under state law as Williams does not connect them to race. *See id.* I treat it as such and do not consider it here.

Oakley responds that Williams fails to show that she reported "unlawful employment practices" as opposed to mere concern about her pay. MSJ at 20. Insisting that "there is no evidence within the record" to support Williams's claim, it notes the lack of "written complaints of discrimination" and avers that Williams could not "identify the date, substance, or specific recipient of any complaint of race or gender discrimination." MSJ at 20.

Oakley misapprehends the evidentiary value of Williams's deposition and affidavit as to what a reasonable jury may conclude regarding her complaints of discrimination. "[A] litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *Rosado v. Sec'y, Dep't of the Navy*, 127 F.4th 858, 864 (11th Cir. 2025) (quoting *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (en banc)). Although Williams's testimony is at times inconsistent, the defendants fail to justify entirely discrediting her claim that she reported racial discrimination to French in August 2021, and a reasonable jury could believe her testimony that she was working during this time. *See Potwin v. Dynasty Bldg. Sols., LLC*, No. 8:24-CV-174-KKM-CPT, 2024 WL 4881385, at *4 (M.D. Fla. Nov. 25, 2024) ("In general, complaining, informally or formally, about an unlawful employment practice is a protected activity.").

Although Williams's statements permit a reasonable jury to infer that she made at least one report of discrimination during her employment, her

statements are otherwise too vague or too distant in time to her termination to permit a reasonable jury to infer a causal connection to her termination. *Johnson*, 169 F.4th at 1311 (explaining, in a retaliation case, that "the burden is on [the plaintiff] to come forward with evidence—not speculation or conjecture—from which a jury could conclude that the [defendant] retaliated against [her] for engaging in protected activity"). Williams asserts in her response that she "continued to complain until Defendant fired her." Resp. at 21 (emphasis added). But her paper does not cite any evidence for the proposition that Williams made complaints up to the time she was fired. *See id.*; FED. R. CIV. P. 56(c)(1), (3) (explaining that parties must support their factual assertions at summary judgment by "citing to particular parts of materials in the record" and that "[t]he court need consider only the cited materials"). Even if I consider the materials cited as evidence of racial complaints generally, such as portions of Williams's affidavit and deposition, none asserts that she complained up to the time of firing. *See, e.g.*, Resp. at 5 (citing Williams Dep. 32:17–36:13, 56:21–59:3, 65:1–66:24, 76:10–78:13, 174:19–176:6). "[W]ithout 'specific supporting facts,' . . . 'conclusory allegations' are not enough to create a genuine dispute of material fact." *Sumrall v. Ga. Dep't of Corr.*, 154 F.4th 1304, 1313 (11th Cir. 2025) (quoting *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)), *cert. denied sub nom. Sumrall v. GA DOC*, No. 25-6517, 2026 WL 1463170 (U.S. May 26,

2026). The only date Williams identifies is August 2021, nearly a year before her termination. *See* Resp. In a similar vein, even if I assume based on Oakley's email evidence, *see* Everitt Decl. at 70–71, that Williams complained in May 2022 *and* that her complaint was about race, a two-month gap between a complaint and discipline, "standing alone, fails to support a reasonable inference of retaliatory intent." *See Johnson*, 169 F.4th at 1311 (holding that a two-month gap between filing an Equal Employment Opportunity Commission complaint and a disciplinary action was insufficient to establish causation at the pretext and mosaic stages); *see also id.* (quoting *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006), for the proposition that "a less than two-week gap between the protected activity and adverse employment action was 'probably insufficient to establish pretext by itself'"). That leaves a jury with only "speculation or conjecture" about causation. *Id.*

For the same reasons and those provided in the prior section, Williams fails to show a convincing mosaic of circumstances to infer that Oakley terminated her in retaliation for reporting race discrimination. *See Berry*, 84 F.4th at 1311. Thus, because Williams fails to demonstrate that her reporting and termination were connected, I grant summary judgment on Count VII.

**C. Workers' Compensation Claim**

I sever and remand Count VII because I lack jurisdiction over the claim. Under 28 U.S.C. § 1441(c)(1), a defendant may remove an action that includes

both a claim arising under federal law and a claim "made nonremovable by statue" as long as "the action would be removable" but for the inclusion of the nonremovable claim. In this situation, the district court must sever the nonremovable claims and remand them "to the State court from which the action was removed." *Id.* § 1441(c)(2).

Williams's claim for workers' compensation retaliation under Florida law is nonremovable under 28 U.S.C. § 1445(c). Accordingly, I must sever and remand the workers' compensation claim. *See Coleman v. C&S Wholesale Grocers, Inc.*, No. 19-20130-CIV, 2019 WL 13235811, at *3 (S.D. Fla. Aug. 26, 2019) ("[U]nder 28 U.S.C. section 1441(c), district courts '*shall* sever' all claims made nonremovable by statute when, as here, they are initially removed as part of a civil case including a separate claim with federal question jurisdiction." (citation omitted)).

**D. Supplemental Jurisdiction**

"In the ordinary course, where the federal claims have been dismissed and the case is before a federal district court solely through supplemental jurisdiction, a court should decline supplemental jurisdiction." *Stalley v. Cumbie*, 586 F. Supp. 3d 1211, 1249 (M.D. Fla. 2022) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)), *aff'd*, 124 F.4th 1273 (11th Cir. 2024). Before doing so, "courts engage in a two-step process: first, the district

court must confirm that it has discretion to decline under § 1367(c); and second, it must consider whether prudential factors counsel against dismissal." *Id.*

Here, I may decline supplemental jurisdiction because Oakley is entitled to summary judgment on "all claims over which [the Court had] original jurisdiction."[4] 28 U.S.C. § 1367(c)(3); *see Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 743 (11th Cir. 2006) ("Any one of the section 1367(c) factors is sufficient to give the district court discretion to dismiss a case's supplemental state law claims.").

Next, I must consider whether "judicial economy, convenience, fairness, and comity" counsel against remanding the remaining state claims. *Ameritox, Ltd. v. Millennium Lab'ys, Inc.*, 803 F.3d 518, 537 (11th Cir. 2015) (quoting *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997)); *see United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). In general, the Eleventh Circuit "encourage[s] district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) (per curiam). That is "particularly the case where . . . the dismissal occurs without any analysis of the merits of the state claims." *Vibe Micro, Inc. v.*

[4] Although § 1367 uses the term "dismiss," the condition is satisfied by an order granting summary judgment. *See Michael Linet, Inc. v. Vill. of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005).

*Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018). The general rule remains true even if "the Court has overseen pretrial litigation and extensive discovery." *Stalley*, 586 F. Supp. 3d at 1249.

As in the usual case, judicial economy, convenience, fairness, and comity support declining the exercise of supplemental jurisdiction. The workers' compensation claim must be remanded, and I have not analyzed the remaining state claims. Remand will not create undue delay or unfairness. While Oakley opted to remove to federal court, the basis upon which it removed—the federal claims—no longer exists. Accordingly, Oakley does not have a right to continue in federal court. Even if the parties would prefer not to return to state court, the Court does not see how it would be unfair to require them to do so. Finally, the completed discovery will help drive expedient resolution in state court, and comity weighs in favor of resolving the state law claims in state court. *See id.* (remanding after granting summary judgment in defendant's favor on the only federal claims); *Bybee v. Knight*, No. 8:15-CV-1026-T-23MAP, 2017 WL 385755, at *6 (M.D. Fla. Jan. 27, 2017) (same).

## IV. CONCLUSION

Accordingly, the following is **ORDERED**:

1. The Motion for Summary Judgment (Doc. 47) is **GRANTED IN PART** and **DENIED IN PART**. The Court grants summary judgment on Counts II and VI.

2. The clerk is directed to enter **JUDGMENT** on Counts II and VI in favor of defendant, to **REMAND** this action to the Circuit Court for the Tenth Judicial Circuit in and for Polk County, Florida, and to **TRANSMIT** a certified copy of this order to the clerk of that court.

3. The Clerk is further directed to **TERMINATE** any pending deadlines, motions, or hearings, and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, July 29, 2026.

Kathryn Kimball Mizelle
United States District Judge